UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SMS FINANCIAL RECOVERY SERVICES, LLC<br>As successor in interest to<br>HARMONY HEALTHCARE INTERNATIONAL, INC.,<br><br>        Plaintiff,<br> vs.<br><br>SAMARITAN SENIOR VILLAGE, INC. d/b/a SAMARITAN SUMMIT VILLAGE,<br><br>        Defendant. | Civil Case No.: 1:20-CV-12135 (MLW) |
| SMS FINANCIAL RECOVERY SERVICES, LLC<br>As successor in interest to<br>HARMONY HEALTHCARE INTERNATIONAL, INC.,<br><br>        Plaintiff,<br> vs.<br><br>SAMARITAN MEDICAL CENTER d/b/a SAMARITAN KEEP NURSING HOME,<br><br>        Defendant. | *Consolidated with:*<br>Civil Case No.: 1:20-CV-12138 (MLW) |

**PLAINTIFF, SMS FINANCIAL RECOVERY SERVICES, LLC AS SUCESSOR IN INTERSET TO HARMONY HEALTHCARE INTERNATIONAL, INC.'S OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT**

**Background**

The case in issue is a case of breach of two three-year services contracts (one for each Defendant) whose 3 year length was negotiated up by Defendants from the 1 to 2 year contract proposed by Harmony to the current 3 years term so that Harmony would lower the monthly charge to $6,100 per month per facility.  Harmony was contracted to review the medical records,

1

medical coding and billing of the Defendant nursing homes in order to help them become more efficient in their medical coding and thus their profitability.  The contracts were entered into in December, 2019.  When covid became an issue in March, 2020, rather than allow physical access to their facilities, remote access or even temporarily suspend the contracts, the Defendants opted to terminate the contracts and take a stubbornly litigious position that Harmony had breached the contract. The contract was terminated for the Defendants' own financial reasons not the lawyer generated reason of Harmony's breach.  The Plaintiff seeks damages in the amount of $6,100 per contract (one for each facility) for the 33 months of unpaid contract (per contract) for a total of $201,300 per contract for a total of $402,600, interest at the rate of 18% and contractual attorney fees).

**Facts (truncated so as not to repeat the Statement of Facts)**

In the case at bar, the Defendants negotiated to be locked into 3 year service contracts for the Plaintiff's services.  When covid became an issue, rather than allow in-person services or remote access (and remote meetings) or even to suspend the contract for a period of time, the Defendants opted to violate the contract and terminate it.  The justification for Samaritan's breach appears to be machinations of their lawyer long after the fact when the contemporaneous documents show that the Defendants terminated the contract because they were completely focused on covid.  In making the argument that the contract was myopically focused on in person visits, the Defendants would try to have this court believe that a vendor that performs two day per month for a maximum of 8 hours per day document review (or even viewing medical personal, if believed) was the basis of the contract for a facility that is open, working and has medical staff working 365 days per year, 24 hours per day.  Put another way, the 16 hours per month where the time was taken up in document review, the Defendants would try to have this

court believe that observation of the medical staff was the heart of the contract. In taking their position, the Defendants completely disregard the testimony of their own witness, Mr. Baranello, the person who was charged by Samaritan with finding Harmony, soliciting Harmony, negotiating the contract Harmony (including being the person who understood the purpose with Harmony) and who signed the Samaritan contracts. Barbara Morrow, the Samaritan witness who terminated the contract, was not relied upon by the Defendants in their Summary Judgment because she had no part in contract formation or execution, including but without limitation to locating, soliciting or negotiating the Harmony contract.

In Harmony, Mr. Baranello was looking for someone that could increase Samaritan's rate of clinical reimbursement, ensure clinical compliance and work with its case mix. Mr. Baranello repeatedly testified that Harmony was hired by Samaritan to perform document review in order to make Samaritan more efficient and effective in its billing of Medicaid and Medicare and thus increase their profitability, and not to perform in person tasks or observe patients or medical care providers. Mr. Baranello negotiated a three-year contract (up from the one or two year contract proposed by Harmony) because the duration of the contract brought the monthly price of the contract down and helped with profitability in the "economies of scale." According to Mr. Baranello, his intent and the purpose of the contract was a document review of the internal documents of Samaritan for purposes of profitability (because Samaritan was putting immense pressure on him to turn around the finances of Samaritan) not the observation of Samaritan's staff or patients. Furthermore, even if there was some incidental observation by Harmony of Samaritan staff performing its work under that contract, according to Mr. Baranello it was not part of the intent of the contract nor was laying eyes on patients part of the contract. Mr. Baranello further stated that even if observation or meetings of some sort was part of the

contract, Mr. Baranello was clear to testify that it could all have been done remotely and, in fact, remote access would have saved Samaritan money.

The contract functioned as it was intended for approximately three months until covid became an issue March, 2020. Samaritan cancelled all visitations after the March 10 and on May 4, according to Barbara Morrow in both her e mail and her voicemail, cancelled the contract for "financial reasons" and covid not the lawyer manufactured after the fact claim that Harmony somehow breached the contract. Even after Samaritan prohibited Harmony from coming onto the premises, refused to allow Harmony remote access and refused to suspend the contract, (a) Mr. Baranello from Samaritan testified that the entire contract could have been performed remotely (giving usernames and passwords, electronic meetings etc…) and (b) he could not fathom a reason why Harmony could not fulfill the contract. Accordingly, the contract remains unpaid for April, 2020 through January, 2023, 33 months per contract at the rate of $6,100 per contract for total damages in the amount of $402,600 plus interest at the rate of 1.5% per month as per the contracts.

**Legal Argument**

**A.**      **Standard of Review for Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences

4

in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Summary judgment's role in civil litigation is "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).  Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 314-315 (1st Cir. 1995).

**B.      SMS is Entitled to Summary Judgment on its Breach of Contract**

In the case at bar, all of the parties are in agreement that there were three year contracts entered into by Samaritan for which services were to be performed and were in fact performed and paid for the months of January, February and March, 2020. It was Samaritan that terminated the contract for "financial" reasons not the bogus "eyes on the patient" reason that Ms. Morrow manufactured after the litigation started and after she sent an e mail explaining why she was canceling the contract and left a voicemail message. Counsel could not have asked Mr. Baranello one more time without abusing the deposition process whether on site or in person visits were (a) contemplated under the contract, (b) at the heart of the contract, (c) a part of the contract or (d) if part of the contract, they could have been performed remotely (both document review and meeting with staff). Mr. Baranello was clear to say that the entirety of the contract as he contemplated it as the person charged with its intent and implementation, could have been fully performed remotely, even if one believed that New York State did not allow vendors into nursing facilities like Samaritan. While it is an issue for the Court as to whether the New York Department of Public Health barred vendors such as Harmony (the directives clearly say

5

"visitor" not "vendor" and clearly allow for remote telehealth), the fact is that (a) Harmony was actually in other New York State nursing homes at the time that Samaritan barred Harmony from appearing at its premises (Batavia, NY and Loretto, NY according to Kris Mastrangelo) and (b) even if one believes or can read the NY directive to bar on site vendors such as Harmony, Mr. Baranello could not have said more times and in more ways that every single contractual obligation of Harmony under the Samaritan contracts could have been performed through (i) remote access (of whatever type, whether it was a secure link giving access to the records, sending the records to Harmony, zoom, skype etc..) and (ii) any and all meetings with Samaritan staff or any other issues that involve human interaction (A) could have been done remotely and, in fact, (B) at his new position, the Harmony tasks were in fact being done remotely.  The fact that Samaritan chose to terminate the contract for "financial" reasons rather than (a) allow remote access, (b) allow in person access, (c) suspend the contract as suggested by Harmony or (d) speak with Mr. Baranello as to the basis and purpose of the contract, was done at their own risk and at their own peril of breach of contract.  For these reasons, and more, Samaritan breached the contract not Harmony.

"An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms." Targus Group Intern., v. Sherman, 76 Mass. App. Ct. 421, 428 (2012).  See McCarthy v. Tobin, 429 Mass. 84, 87 (1999); Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 828 (2000).  The interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation.  USM v. Arthur D. Little Systems, Inc., 28 Mass.  App. Ct. 108 (1990) citing Robert Indus., Inc. v. Spence, 362 Mass. 751, 755 (1973); Fred S. James & Co. of New England, Inc. v. Hoffmann, 24 Mass. App. Ct. 160, 165 (1987).  See also Restatement

6

(Second) of Contracts § 212(2) & comment d (1981)).  When interpreting the contract, "[t]he object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose." McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264 (1962); Kerrigan v. Boston, 361 Mass. 24, 33 (1972); Thomas v. Christensen, 12 Mass .App. Ct. 169, 175 (1981); Finn v. McNeil, 23 Mass. App. Ct. 367, 372 (1987).

In the case at bar, there is no dispute that (a) there were two binding three year contracts between Harmony and the Defendants with a duration of three years of January, 2020 and January, 2023, (b) that services were not performed by Harmony after March, 2020 because Samaritan would not allow them to be performed and that (c) the Defendants did not allow Harmony to perform nor did the Defendants pay for any services after March, 2020.  In terms of the creation of the contract, Mr. Baranello for Samaritan negotiated a longer three year duration of the contract with Harmony in order to bring the monthly cost down for "economies of scale." In the extensive questioning of Mr. Baranello in his deposition, he is clear to say that this contract was purely a document review contract and that eyes on the patients or even on the staff was not contemplated, required, performed or an essential performance under the contract, except possibly incidentally.  Mr. Baranello stated that he could not think of a reason why Samaritan could not have fulfilled the Harmony contracts.  The Defendants attempt to make in person observation the central focal point of the contract but because Ms. Morrow was not part of contract, its intent, its solicitation, negotiation, formation or even performance (until Mr. Baranello left around February 5, 2020), she was in absolutely no position to give any testimony about the purpose or intent of the contract.  Even if one could be lulled into the twisted logic of Ms. Morrow and the Defendants that eyes on the patients or staff was a Harmony contract requirement, putting aside the fact that Ms. Monahan from Harmony was not even qualified to

do that, Mr. Baranello was clear to say that the Harmony obligations could have been performed remotely (all of them) as they are being done remote for the company doing similar work to Harmony for his current employer.  It was Ms. Morrow who terminated the contract and put Samaritan in breach of the contracts.  Harmony made clear in its numerous e mails that it was ready willing and able to (a) perform the contract (directly coming in or remotely) or even (b) suspend the contract until Samaritan was ready.  Ms. Morrow rejected both of those attempts at performance.

The Defendants attempt to rely on the NYS directives as a defense.  A reading of the NYS Directives make clear that "visitors" (undefined) were to be limited not excluded.  Harmony was a vendor and the Directives do not speak to a vendor.  Furthermore, through the overly expansive reading of the Directives by Samaritan, one could not even have a myriad of other vendors enter the facilities, not even to serve its patients food and vendors for basic life services.  Accordingly, the Defendants are misreading the Directives in an overly expansive way not intended by the State of New York in order to justify their breach of the contract and in an attempt to throw the breach back on Harmony.  Even if one read the Directives as expansively as the Defendants, remove access would have resolved the entirety of the issue.  Alternatively, as Harmony suggested, suspending the contracts for a short period would also have worked.  For these reasons, Samaritan breached the contract and as a result of breaching the contract, they are liable to the Plaintiff for the remainder of the contract.

C.      **The Defendant Loses on the Frustration of Purpose and Similar Doctrines**

Neither party disputes that there was a binding contract.  The issue is that Samaritan breached the contract when it unilaterally terminated the contract (the court can see from the testimony and documents that Harmony went through yeoman's efforts to try to accommodate

Samaritan in its performance of the contracts – from remote access/visits to temporarily suspending the contract – all of which were rejected by Samaritan).  Putting aside the fact that Mr. Baranello, the person from the Defendant who actually solicited Harmony, negotiated the contract terms and hired Harmony, testified that this was purely a document preview contract, other facilities were allowing on site vendors (see Affidavit of Kris Mastrangelo).  Assuming for the sake of argument that on site viewing of the documents by Harmony was precluded by the State of New York, this impediment (or frustration of purpose or force majeure, however characterized), was completely undermined when the Defendant by Ms. Morrow testified that out of this three-year contract whose elongated duration was specifically negotiated and requested by Samaritan, vendors were only precluded from Samaritan for just a few months.  In a case recently decided by the Supreme Judicial Court, the Court did NOT let the defendant terminate the contract due to a covid frustration and ruled that even if there was an impediment and the impediment is temporary, the doctrine calls for a suspension of the contract until the impediment is cleared, not the complete termination of the contract particularly in a case like the case at bar where Mr. Baranello, the most knowledgeable person about the contract, testified that (a) Harmony could have performed all services remotely and (b) on site viewing of patients and staff was not contemplated or a core part of the contracts.  The Court can see from the testimony of Ms. Morrow, e mails and the objective documentation that Samaritan was offered a remote access option and more importantly a suspension of the contract, but Samaritan declined the suspension option and opted to terminate/breach the contracts.  Frustration of purpose is a narrowly construed doctrine.

> For the doctrine to apply, the purpose that is frustrated "must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Le Fort Enters., Inc., supra at 161, 199 N.E.3d 1257, quoting Restatement (Second) of Contracts § 265 comment a. The doctrine is construed narrowly "so as to

9

preserve the certainty of contracts," and the party asserting frustration of purpose as a defense bears the burden of establishing it. Le Fort Enters., Inc., supra at 151, 199 N.E.3d 1257, quoting 17A Am. Jur. 2d Contracts § 641 (2022).

Inland Commercial Real Estate Services, Inc. v. ASA EWC, LLC, 102 Mass.App.Ct. 796, 798, 213 N.E.3d 604, 607 (2023). In order for the frustration rule to apply, performing the contract would be of little sense. The devastating testimony of Mr. Baranello that the focus, focal point and purpose of the contract was a document review to make Samaritan's billing more efficient completely undermines any assertion that on site performance of the contract goes to the basis of the contract. Furthermore, Mr. Baranello testified innumerable times that all of the obligations of Harmony under the contract could have been performed remotely and the contract did not contemplate in person services with the patient and staff as a core focal point. Mr. Baranello's testimony completely undermines the after the fact excuses that were manufactured lawyers for the Defendants who were not part of the contracting process.

> The doctrine of frustration of purpose excuses performance under a contract in limited circumstances "where unanticipated supervening events require it." Le Fort Enters., Inc. v. Lantern 18, LLC, 491 Mass. 144, 150, 199 N.E.3d 1257 (2023). Specifically, "[w]here ... a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged," unless the contract provides otherwise. Chase Precast Corp. v. John J. Paonessa Co., 409 Mass. 371, 375, 566 N.E.2d 603 (1991), quoting Restatement (Second) of Contracts § 265 (1981).

Inland Commercial Real Estate Services, Inc. v. ASA EWC, LLC, 102 Mass.App.Ct. 796, 798, 213 N.E.3d 604, 607 (2023).

The principle purpose of the contracts (as stated Mr. Baranello) were document review to make the Defendants more efficient in their billing and coding which could have been done remotely. This purpose was not frustrated by covid or the NYS directives. It was only Ms. Morrow (who was not part of the contract formation) who claimed the purpose of the contract

was in person but clearly, from a read of the contract and the testimony of Mr. Baranello (the solicitor, negotiator and signatory of the contract), its primary purposes was document review and document efficiency not in person viewing.  Ms. Morrow is not a percipient witness of the contracts' formation or their purpose.  Mr. Baranello was also clear to say that the entire basis of the contract and all of its contemplated duties, even if viewing the staff was part of the agreement, could have been performed remotely, whether through electronic entry, zoom, Teams meetings etc… Mr. Baranello testified that he could think of <u>no reason</u> why Samaritan should not have complied with or otherwise performed the contracts.

Additionally, because, according to Mr. Baranello, the contractual obligations of Harmony were document review that could have been done remotely, this doctrine is not available to them.  If the Court deems in person review to be a part of the basis of the contract, the <u>Inland</u> case even went on to say when the frustration is temporary (provided that the frustration goes to the heart of the contract), the contracts are suspended during the term of the frustration not terminated.

> that "the frustration of purpose defense can be temporary." <u>Le Fort Enters., Inc</u>., 491 Mass. at 161, 199 N.E.3d 1257. But in that situation, "the defense will <u>suspend, rather than discharge</u>, a duty to perform unless the party's 'performance after the cessation of the ... frustration would be materially more burdensome than had there been no ... frustration' " (emphasis added). <u>Id</u>., quoting Restatement (Second) of Contracts § 269.

<u>Inland Commercial Real Estate Services, Inc. v. ASA EWC, LLC</u>, 102 Mass.App.Ct. 796, 799, 213 N.E.3d 604, 608 (2023).  Ms. Morrow through her own testimony and through the objective documentation was offered the alternative to suspend the contract by Harmony .  Her response was a resounding NO she was not going to suspend the contracts, she was going to terminate them.  Accordingly, because Samaritan failed to perform under the contracts, they are in breach of the contracts and cannot use frustration or any other similar doctrine as a defense.

### D. <u>Count III For Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

In the case at bar, Samaritan is trying to walk away from the contract and deny the Plaintiff the fruits of the contract.  Harmony tried very hard to accommodate Samaritan in the performance of the contract when taking into consideration Samaritan's position that NYS would not allow vendors into their premises.  Rather than acquiesce in this complete disregard of the contractual terms, Harmony attempted to have Samaritan engage them remotely by giving them remote access or, if remote access was rejected, even to suspend the contract and as the Court can deduce from this litigation, they also were not going to pay under the contract.  Again, Ms. Morrow was clear to say that it was her decision to refuse to suspend the contract and to terminate them fully.  From there, Samaritan has made it an odyssey of stubborn litigation and denial of the Plaintiff that there is any money due under the contract.  Samaritan was content to run up tens of thousands in legal bills defending is untenable position.

According to the Restatement Second, section 205 "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  The implied covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." <u>Anthony's Pier Four, Inc. v. HBC Associates</u>, 411 Mass. 451, 471–72 (1991) (quotations omitted). Put another way, the parties to a contract implicitly agree "to deal honestly and in good faith in both the performance and enforcement of the terms of their contract." <u>Hawthorne's, Inc. v. Warrenton Realty, Inc.</u>, 414 Mass. 200, 211 (1993). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." <u>Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.</u>, 441 Mass. 376, 385 (2004). According to Restatement Second, Contracts § 205, comment a. See <u>Wilder v. Toyota Financial Services Americas Corp.</u>, 764 F. Supp. 2d 249, 258 (D. Mass. 2011)

(applying Mass. law) (purpose of covenant of good faith and fair dealing is to guarantee that parties remain faithful to intended and agreed expectations of parties in their performance). See Lass v. Bank of America, N.A., 695 F.3d 129, 137–138 (1st Cir. 2012) (applying Mass. law) (purpose of implied covenant of good faith and fair dealing is to ensure that neither party interferes with the ability of others to enjoy fruits of contract and that when performing obligations of contract, the parties remain faithful to the intended and agreed expectations of the contract). Good faith means that a party to a contract must be honest in dealings with the other party and not "do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract". Anthony's Pier Four, Inc. v. HMC Assoc., 411 Mass 451, 471-2 (1991) (quotations omitted). "A party may breach the covenant of good faith and fair dealing ... without breaching any express term of th[e] contract. Otherwise, the implied covenant would be a mere redundancy." Biltcliffe v. CitiMortgage, Inc., 952 F.Supp.2d 371, 381 (D.Mass. 2013) (quoting Massachusetts v. Schering-Plough Corp., 779 F.Supp2d 224, 240 (D.Mass 2011) (other citations omitted).

      In the case at bar, it is clear that Samaritan has done its best to deny the Plaintiff and Harmony the fruits of the contract. When covid came and Samaritan decided or read the NYS rules to say that vendors could not come into the Samaritan facilities, Harmony offered to do its work remotely. Samaritan's own witness (Mr. Baranello) testified that remote access was possibly, that the entirety of Harmony's contractual obligations could have been performed remotely, remote access would have saved money for Samaritan and remote access is the way that it is currently being done at the facility where he currently works at. In an attempt to live up to the terms of the contract, Harmony even offered to suspend the contract until Samaritan was ready. Rather than stay faithful to the intended purpose of the contract whether the services be

provided in person, remote access or suspect the contract, the Samaritan defendants took the hardline position to deny the fruits of the contract to Harmony, refuse to pay and to take a stubbornly litigious position against Harmony. Samaritan was content to terminate the contracts, not work with Harmony and then become stubbornly litigious in their position. For these reasons, the Defendants breached the implied covenant of good faith and fair dealing.

### E. Samaritan's Breach of Implied Covenant of Good Faith and Fair Dealing Cause a Violation of 93A

In the case at bar, Samaritan through its actions, policies, conduct, intentional breach of contract and then becoming stubbornly litigious, has willfully and knowingly violated M.G.L. c. 93A. Almost the entirety of the Plaintiff's Opposition and Cross Motion for Summary Judgment relies on the testimony of Mr. Baranello, the Samaritan employee who solicited, negotiated and contracted with Harmony for the services contemplated under the contract. Rather than speak with Mr. Baranello as to the intention of the contract and what was contemplated under the contract, Samaritan threw Ms. Morrow's position out in the line of fire to tell half truths and misdirection in a straightforward case. Mr. Baranello made clear that the work contemplated under the contract was a pure document review for which no in person review was necessary, required or even contemplated or essential. Rather than cite to one word of testimony from Mr. Baranello in its Motion for Summary Judgment, Samaritan relied solely on the position of Mr. Morrow, a woman who Samaritan personnel agree was not part of the contract solicitation, negotiation or formation and who nothing about the intent of the contract.

According to the courts interpreting M.G.L. c. 93A, "[i]It has been held, generally, that for conduct to violate the standard of §2 (a), (1) it must fall within at least the penumbra of common-law, statutory or other established concept of fairness, (2) it must be unethical or unscrupulous, and (3) it must cause substantial injury to a consumer or another businessman."

Wasserman v. Agnastopoulos, 22 Mass. App. Ct. 672, 679 (1986). The focus for determining unfairness is "on the nature of the challenged conduct and on the purpose and effect of that conduct." Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995). A "deceptive act that is the result of a defendant's negligence" is all that is needed for a claim for c. 93A. Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983). "Courts have deliberately avoided setting down a clear definition of conduct constituting a violation of G.L. c. 93A." Spence v. Boston Edison Co., 390 Mass. at 616. "It has been held, generally, that for conduct to violate the standard of §2(a), (1) it must fall within at least the penumbra of common-law, statutory or other established concept of fairness, (2) it must be unethical or unscrupulous, and (3) it must cause substantial injury to a consumer or another businessman." Wasserman v. Agnastopoulos, 22 Mass. App. Ct. 672, 679, 497 N.E. 2d 19(1986), quoting PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915 (1975); see also Linkage Corp. v. Trustees of Boston University, 425 Mass. 1,27, 679 N.E.2d 191(1997). The focus for determining unfairness is "on the nature of the challenged conduct and on the purpose and effect of that conduct." Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43, 648 N.E.2d 435 (1995).

First and foremost, a breach of the implied covenant of good faith and fair dealing can and does form the basis of a claim under M.G.L. c. 93A.

> [C]ourts have held that claims of violation of the implied covenant of good faith and fair dealing are not simple breach of contract claims for purposes of Chapter 93A. *See Trent Partners,* 120 F.Supp.2d at 106-107; Tufankjian v. Rockland Trust Co.*,* 57 Mass.App.Ct. 173, 178-179, 782 N.E.2d 1 (2003); Anthony's Pier Four [v. HBC Associates]*,* 411 Mass. [451], 476, 583 N.E.2d 806 [1991]. Inherent in such claims is "an element of either bad faith and improper motive or a breach of fair dealing ..." that clearly falls within "`established common law ... concept[s] of unfairness.'" Trent Partners*,* 120 F.Supp.2d at 107 . . ..

15

Speakman v. Allmerica Financial Life, Ins., 367 F.Supp.2d 122, 140 (2005) (other citations omitted).

In the case at bar, Samaritan has willfully and knowingly breached its contract with Harmony and became stubbornly litigious when the Plaintiff sought to enforce the contract. Rather than speak with their own witness, Mr. Baranello, as to the purpose, intent, spirit and terms of the contract against its intended purpose, Samaritan chose to cherry pick certain limited facts that do not even support their position. Nowhere in the contract solicitation, negotiation or performance, according to Mr. Baranello was in person or on site contemplated as an integral part of the contract. A review of the contemporaneous communications with Ms. Morrow make clear that Samaritan was terminating the Harmony contracts for "financial" reasons not the after the fact, lawyer inspired machination of an excuse that Harmony somehow breached the contract. Harmony, in fact, tried to do everything that it could to work with Defendants to get to the intended purpose of the contract. Samaritan, rather than speak with their own witness to understand the intended purpose and functioning of the contract, and resolve the matter, became stubbornly litigious even after hearing the testimony of their own witness, Mr. Baranello. Mr. Baranello gutted any defense that the Defendants could possibly raise. Rather than understand and abide by the intended purpose of the contract, the Defendants ginned up a bogus defense that is contrary to the contemporaneous documents, the testimony of its own witness to deny Harmony the fruit of the contract. The Defendants' conduct was unfair and deceptive and was willfully and knowingly unfair and deceptive.

WHEREFORE, the Plaintiff requests (a) Summary Judgment enter in favor of the Plaintiff in the amount of $201,300 on each contract (for a total Judgment on the breach of contract in the amount of $402,600) plus interest at the rate of 18%, (b) enter an ORDER that the

Defendant's conduct was unfair and deceptive, (c) enter an ORDER that the Defendants' conduct was knowingly unfair and deceptive, (d) multiple damages and (e) leave to file an Affidavit of Attorney Fees as allowed under the contract (and 93A).

The Plaintiff,
**SMS FINANCIAL RECOVERY SERVICES, LLC**
**As successor in interest to**
**HARMONY HEALTHCARE INTERNATIONAL, INC.,**

By its attorney,

| | |
|---|---|
|   /s/ Carlo Cellai, Esq | January 25, 2023 |

Carlo Cellai, Esq., BBO No. 558651
**Cellai Law Offices, P.C.**
150 Grossman Drive, Suite 201
Braintree, MA 02184
(617) 367-2199
Carlo@Cellailaw.com

17