UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SMS FINANCIAL RECOVERY SERVICES, LLC, as successor in interest to HARMONY HEALTHCARE INTERNATIONAL INC., | * * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 1:20-cv-12135-IT |
| SAMARITAN SENIOR VILLAGE, INC. d/b/a SAMARITAN SUMMIT VILLAGE, | * * * | |
| Defendant. | * * | |

| | | |
|---|---|---|
| SMS FINANCIAL RECOVERY SERVICES, LLC, as successor in interest to HARMONY HEALTHCARE INTERNATIONAL INC., | * * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 1:20-cv-12138-IT |
| SAMARITAN MEDICAL CENTER d/b/a SAMARITAN KEEP NURSING HOME, | * * * | |
| Defendant. | * | |

MEMORANDUM & ORDER

July 18, 2024

TALWANI, D.J.

    This consolidated action arises out of three-year contracts for healthcare consulting

services between Harmony Healthcare International Inc. ("HHI") and Defendants Samaritan

Medical Center d/b/a Samaritan Keep Nursing Home and Samaritan Senior Village d/b/a

Samaritan Summit Village (collectively, "Samaritan"). Pursuant to these contracts, beginning in

December 2019, HHI was to provide auditing and education services to each Defendant. After the onset of the COVID-19 pandemic and related restrictions on in-person visitors, Samaritan terminated the contracts. In November 2020, HHI brought a suit against each Defendant.

In November 2023, after HHI filed for bankruptcy protection, its secured creditor, Plaintiff SMS Financial Recovery Services, LLC, filed an Amended Complaint in each action as HHI's successor in interest. Plaintiff asserts HHI's claims for breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, and Massachusetts General Law chapter 93A violations and seeks the outstanding balance on the remaining term of the Master Agreements (April 2020 through December 2023). Following consolidation of the two actions, Samaritan moved for summary judgment contending, inter alia, that HHI's breach of contract fails because HHI materially breached the contracts when it failed to perform on-site visits in April and May of 2020 and that in any event Samaritan's own failure to perform was excused by the doctrines of impossibility/impracticability. Samaritan asserts further that Plaintiff's remaining claims are foreclosed as a matter of law. Plaintiff opposed and cross-moved for summary judgment on the breach of contract claim, arguing that HHI was able to substantially perform its part of the bargain remotely, and that Samaritan breached the Master Agreements by unilaterally terminating them. For the reasons set forth herein, Defendants' Motion for Summary Judgment [Doc. No. 53] is GRANTED and Plaintiff's Cross-Motion for Summary Judgment [Doc. No. 57] is DENIED.

## I.    Factual Background

### A.    *The Parties to the Contract*

Defendant Samaritan Summit Village ("Samaritan Summit") is an assisted living and skilled nursing facility. Pl. Resp. Def. SOF ¶ 1 [Doc. No. 78]. Defendant Samaritan Keep

Nursing Home ("Samaritan Keep") is a long-term care facility. Id. Both facilities are located in Watertown, New York. Id.

HHI was an independent third-party consulting company that "provide[d] the healthcare industry with services under the umbrella of compliance, auditing, analysis, education, efficiency, regulatory, and survey." Berman Decl., Ex. A (Mastrangelo Depo. 14:1–6) [Doc. No. 54-1].

B.    *The 2019 Master Agreements and Orders of Services*

Samaritan Summit and Samaritan Keep each entered into a Master Agreement for Consulting Services dated December 19, 2019, together with an Order of Services, with HHI. Berman Decl., Ex. F (Samaritan Summit Master Agreement) [Doc. No. 54-3] & Ex. E (Samaritan Keep Master Agreement) [Doc. No. 54-2] (collectively, the "Master Agreements"). The two Master Agreements are identical in all material and relevant aspects. Pl. Resp. Def. SOF ¶ 1 [Doc. No. 78]; compare Samaritan Keep Master Agreement [Doc. No. 54-2] with Samaritan Summit Master Agreement [Doc. No. 54-3]. Robert Baranello, as Samaritan's Vice President of Post-Acute Care, signed the Master Agreements and the Orders of Services on behalf of Samaritan, and Kris Mastrangelo, as HHI's President and CEO, signed the Agreements and Orders of Services on behalf of HHI. See Master Agreements and Orders of Services 9, 23 [Doc. No. 54-2 and 54-3].

The purpose of the arrangement was for HHI to "strategically review patient information" and "optimiz[e] the scoring for the case mix index," Baranello Depo Tr. 27:2–10 [Doc. No. 76-1], which would help Samaritan improve its Medicaid reimbursement rate, id. at 44:18–21.

The Master Agreements provided that the Orders of Services were for a three-year term. Master Agreements § 3 [Doc. Nos. 54-2 and 54-3]. The Orders of Services listed a "Schedule of

Platinum CARE Plan Services" that HHI was to provide at each facility. Order of Services 17 [Doc. Nos. 54-2 and 54-3]. Pursuant to the Master Agreements, Samaritan's payment under the Platinum CARE Plan covered both the provision of "consulting services" and the grant of a license to "use HHI's confidential and proprietary HarmonyHelp website." Id. § 2; see id. § 3 ("In return for the Consulting Services and the License . . . the Client and the Facility shall be jointly and severally obligated to pay to HHI the fees . . . set forth on the attached order.").

The Master Agreements defined "Consulting Services" as "any work provided by HHI pursuant to this Agreement," Master Agreements 3 [Doc. Nos. 54-2 and 54-3], and specified that "[i]n order to carry out the Consulting Services, the Client shall provide HHI and its representative[]s full access to its facilities, books and records, employees, and, in accordance with applicable law, its patients and their medical, treatment and other records." Id. § 1(c).

The Master Agreements further provided that "[i]n the event that the Client cancels a site visit by HHI within the fifteen-day period immediately prior to its scheduled date, the Client and the Facility shall be jointly and severally obligated to pay to HHI HHI's agreed upon fees and expenses incurred for such site visit." Id. § 3. The Master Agreements contained an integration clause, which included the schedule of services as part of the integrated writing. Id. § 8(d). They also contained an attorney's fees provision that entitled HHI to recover "attorneys fees and costs incurred to enforce the agreement" in the event of a breach by Samaritan. Id. § 8(f).

The Orders of Services detailed the services HHI was to provide to Samaritan under the Platinum CARE Plan. The Orders specified that: "Two (2) Days Per Month – initial visits (first three months) to focus on Rehabilitation Consulting, PDPM Evaluation Review and Quality Measures. Focus will then shift to improve Case Mix Index. Services focus on performing medical review, systems refinement and education." Orders of Services 17 [Doc. Nos. 54-2 and

54-3]. The Orders also laid out eighteen specific types of activities HHI would be performing, including "MDS/PDPM Assessments" (which itself had a subset of provided services including "MDS audit[s] and associated chart reviews," "auditing documents to ensure timely completion, accuracy, and state transmission," "educating the team on coding and case management techniques"); "Part A Coverage" determinations; "Medicare Manual and More"; "Reports"; "Customized Training"; "Analysis"; "Other Areas" including Part B revenue analysis, rate setting, and budgeting; "Beneficiary Review Meeting Attendance"; "Medicare Documentation"; "Denials Management" assistance; "Medicare Clinically Anticipated Stay" review; "Rehabilitation Systems Assessment"; "Medicare Profitability"; "Restorative Nursing" program implementation assistance; "Educational seminars"; "Therapy analysis"; "Rehabilitation Training Modules"; and "Subsequent visits" follow-through assessment. Several of these enumerated categories contained specific references to the site visits themselves.[1]

The penultimate page of the Orders for Services is a Schedule of Fees, which read:

| Description | Monthly Fee |
|---|---|
| **Platinum C.A.R.E. Plan**<br>• Two (2) Day on-site visits per month<br>• Three (3) year term | **$6,100** |
| **HarmonyHelp (6 user licenses)** | **Included** |
| **TOTAL** | **$6,100** |
| **Additional Days**<br>**$1,900 Per Day Per Specialist** | |

[Doc. No. 54-2 at 22, Doc. No. 54-3 at 22].

---

[1] These categories were "Reports," "Customized Training," and "Therapy Analysis." "Part A Coverage" also stated that HHI would "assist[] the facility (on-site and off-site) in making appropriate coverage determinations on Part A beneficiaries through on-site chart review and/or telephone/fax review."

C.    *An HHI Representative Performs Site Visits in January, February, and March 2020*

HHI sent a representative, Kathleen Monahan, to Samaritan's Watertown locations for two days per site in January, February, and March of 2020. Monahan was present at the facilities from approximately 8 a.m. to approximately 5 p.m. on each site visit. Sherman Decl., Ex. 3 (Monahan Depo. Tr. 37:19–20) [Doc. No. 76-3]. During the visits, Monahan reviewed documents related to billing and coding, met with staff to discuss coding issues, id. at 41:2–12, and conducted exit meetings, id. at 53:9–12. While Monahan was on site, she generated notes on each facility's practices and documentation that were later typed up and formatted for reports which were sent to the corporate office at HHI and sent to Samaritan. Id. at 37–39.

Monahan's March visits occurred on March 12 and 13, 2020.

D.    *New York Issues COVID Restrictions*

On March 7, 2020, the governor of New York issued an Executive Order declaring a state of emergency due to the COVID-19 pandemic. Berman Decl., Ex. J [Doc. No. 54-7].

On March 12, 2020, the governor extended the Executive Order, and made guidance set forth by the New York State Department of Health "related to prevention and infection control of COVID-19 at nursing home and adult care facilities . . . effective immediately." Berman Decl., Ex. K [Doc. No. 54-8].

On March 13, 2020, the New York State Department of Health issued a Health Advisory specific to nursing homes and adult care facilities. The Department of Health stated that "[h]ealthcare personnel (HCP), other direct care providers and visitors who enter NHs [nursing homes] and ACFs [adult care facilities] while symptomatic or asymptomatic with COVID-19 present a high risk for outbreaks." Berman Decl., Ex. L [Doc. No. 54-9]. The Department of Health ordered all nursing homes and adult care facilities to "suspend all visitation except when

medically necessary (i.e. visitor is essential to the care of the patient or is providing support in imminent end-of-life situations) or for family members of residents in imminent end-of-life situations, and those providing Hospice care." Id.

     E.     *The Proposed Remote Site Visits for April*

On March 31, 2020, Mastrangelo's executive assistant, Brittany Bertone, sent an email to Samaritan representatives with the subject line "Samaritan April Visits with HHI." The email stated:

> COVID-19 has been an issue for many of our clients. We are aware that many facilities are limiting visitation for the safety of everyone. While we would love to conduct in person audits and interact with your staff we understand this could be a problem. To provide you the best possible consulting without putting anyone at risk we are offering remote audits if you have these restrictions. This will keep everyone safe from spreading germs and will still let us provide you with our services, as to not fall behind. While we cannot access your software remote Kathy [Monahan] is willing to come to NY if you have a computer she could use at a local hotel.

> Please let me know if the HHI team is allowed to be at your facility or if you would could [sic] provide a computer for a remote audit on April 7-8, 2020 for Summit and April 9-10 for Keep. Sherman Decl., Ex. 9 [Doc. No. 76-9].

Later that day, Barbara Morrow, Samaritan's Chief Compliance Officer, responded that "we will need to postpone the visit on site or remotely as our complete focus is on COVID right now. I'm afraid even remotely we would not receive the value of the visit as our goal is to audit and educate our staff and it just wouldn't be feasible. The president just issued another 30 days of social distancing so we will look to postpone into May and should touch base prior to make sure we are out of the woods." Id., Ex. 10 [Doc. No. 76-10].

HHI did not provide auditing services in April 2020.

     F.     *The May and June 2020 Communications*

On May 4, 2020, Morrow sent a letter to Mastrangelo stating:

> Due to the extreme financial constraints that the COVID-19 pandemic has placed on our healthcare organization, we have been forced to make the decision to discontinue many contracts system wide. Please allow this letter to serve as the formal notice of termination between Samaritan Keep Nursing Home, Inc. and Harmony Healthcare International.

Id., Ex. 16 [Doc. No. 76-16].

On May 6, 2020, Bertone emailed Morrow about site visits scheduled for Samaritan Keep on May 14–15 and Samaritan Summit on May 12–13. Id., Ex. 17 [Doc. No. 76-17]. Bertone asked Morrow to let her know if Morrow "would like an on-site or remote audit." Id. The email continued that "[e]ven with remote audits we can help with compliance, reimbursement, survey & regulatory, emergency preparedness, facility assessments, etc." Id. Morrow responded within ten minutes, stating that "[d]ue to the pandemic and the restrictions on visitors of any type as well as the extreme financial situations this epidemic has put on our healthcare system, both Samarian Nursing Homes (Keep Home and Summit Village) will need to cancel our contracts." Id. She stated further that she "ha[s] been in communication with Kris Mastrangelo last week about this and letters went out on Monday." Id.

Bertone responded that afternoon that she "just spoke with Kris and there are no early termination provisions in the contract." Id. She continued, "I have your next scheduled visits from June 9-12, 2020. Please let me know how you would like to proceed." Id. Morrow responded to Mastrangelo directly, asking "what your legal counsel advises as we have been told to cancel all contracts as they cannot be performed due to COVID-19 mandates . . . ." Sherman Decl., Ex. 12 [Doc. No. 76-12]. Mastrangelo then emailed Morrow, stating that HHI was "open to a suspension of the contract." Id.

On May 14, 2020, Samaritan's counsel sent a letter to Mastrangelo. The letter stated:

> Please consider this letter to be Notice of Termination of the Agreements, effective immediately, based upon Harmony Healthcare International's ("Harmony") breach of the Agreements due to its failure to provide services in

accordance with the terms of the Agreements beginning in April 2020. The
restrictions placed on Nursing Homes by the State of New York during the Covid-
19 pandemic make it impossible for Harmony to perform the on-site services
required by the Agreement now and for the foreseeable future. Therefore, the fact
is Harmony has been, and will continue to be, unable to perform its obligations
under the Agreements. This letter supersedes and replaces Ms. Morrow's May 4,
2020 letter.

Berman Decl., Ex. I [Doc. No. 54-6].

On June 18, 2020, Mastrangelo sent a signed letter to Morrow, thanking her for using

HHI's services and stating "I am sorry to hear that you are leaving us." Id., Ex. H [Doc. No. 54-

5].

## II.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st

Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving

party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied

in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-

moving party's claim or (2) by demonstrating that the non-moving party failed to establish an

essential element of its claim. Id. at 323–24.

Once the moving party establishes the absence of a genuine dispute of material fact, the

burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of

material fact remains. Id. at 314.  The non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

Under Massachusetts law, contract interpretation, including determinations about contract ambiguity, are ordinarily questions of law. See Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516, 258 N.E.2d 786 (1970). In making those determinations, the court looks to the plain language of the contract. Id. "[W]hen the language of the contract is clear, it alone determines

10

the contract's meaning, but . . . a court may consider extrinsic evidence if the language is ambiguous." <u>Balles v. Babcock Power Inc., 476 Mass. 565, 571, 70 N.E.2d 905 (2017).</u> "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." <u>Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.,</u> 419 Mass. 462, 466, 645 N.E.2d 1165 (1995). Rather, contract language is ambiguous only when "it can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." <u>Balles</u>, 476 Mass. at 571. And where the contract is unambiguous, it must be enforced according to its terms. <u>Freelander</u>, 357 Mass. at 516.

### III.   Discussion

#### A. *Breach of Contract Claim*

##### 1.   HHI Did Not Breach the Contract First by Failing to Appear in Person

Samaritan's first defense against HHI's breach of contract claim is that HHI breached the Master Agreements first—before Samaritan terminated the contracts—by failing to appear for on-site visits in April 2020. But this argument ignores the Master Agreements' "Access to Customer Materials and Facility" clause which obligated Samaritan to provide HHI "full access to . . . facilities, books and records, employees, and . . . patients and their medical, treatment and other records" <u>See</u> Master Agreements 4 [Doc. Nos. 54-2 and 54-3]. Samaritan does not dispute that for the months of April and May 2020, it did not provide HHI that access.

Because "full access" to Samaritan's materials and facility was a prerequisite for HHI to conduct its Consulting Services, HHI did not breach the contract first by failing to provide in-person consulting services.

2.  Samaritan's Termination of the Contract is Excused by the Doctrine of
    Impossibility/Impracticability

Samaritan argues next that its termination of the contract is excused by the doctrines of

impossibility/impracticability. The court agrees.

"The important question [in these doctrines] is whether an unanticipated circumstance

has made performance of the promise vitally different from what should reasonably have been

within the contemplation of both parties when they entered into the contract. If so, the risk

should not be fairly thrown upon the [party seeking to be excused]." Le Fort Enterprises, Inc. v.

Lantern 18, LLC, 491 Mass. 144, 153, 199 N.E.3d 1257 (2023). The doctrine of impracticability

"excuses performance of a contract where (1) an event occurring after the execution of the

contract makes the contract's performance impossible or impracticable; (2) nonoccurrence of the

event was a basic assumption on which the contract was made; and (3) the party who seeks to

have his or her performance excused did not cause the event." In re Boston Univ. COVID-19

Refund Litig., 2023 WL 2838379, at *3 (D. Mass. Apr. 7, 2023) (quoting Martorella v. Rapp,

2021 WL 3234312, at *3 (Mass. App. Ct. July 30, 2021)).

Elements (2) and (3) of the doctrine of impracticability are undisputedly met here:

Samaritan did not cause the COVID-19 pandemic or the New York State Department of Health's

response to that pandemic, nor did either party contemplate the possible consequences of a

global pandemic when entering into the Master Agreements in December 2019. The issue is

whether the suspension of visitations made contract performance impossible or impracticable.

HHI contends that New York State guidelines limiting access did not apply to HHS employees,

as they were "vendors" rather than "visitors." But the Department of Health's guidelines

suspending visitations during April, May, and June of 2020 did not distinguish between medical

personnel and "visitors"; instead, they distinguished between visitations that were "medically

necessary" for a patient's care and those that were not. See Berman Decl., Ex. L [Doc. No. 54-9].

HHI did not provide medical services or treat patients as part of its consulting services. See

Sherman Decl., Ex. 3 (Monahan Depo. Tr. 63–64) [Doc. No. 76-3]. Therefore, pursuant to the

State order, HHI representatives were among the class of non-essential personnel prohibited

from entering Samaritan's facilities.

Accordingly, under the doctrine of impossibility/impracticability, Samaritan did not

breach the contract by terminating it where the New York State Department of Health guidelines

made it illegal for Samaritan to allow HHI representatives inside its facilities and where HHI's

physical access to Samaritan's facilities and materials was necessary for performance as

contemplated in the contract. See In re Boston University COVID-19 Refund Litig., 2023 WL

2838379, at *3 (D. Mass. April 7, 2023) ("[N]o jury could find that [defendant] 'undertook an

absolute obligation to perform' according to the terms of the alleged contract and assumed the

risk should continued performance become unlawful.").

3.   Whether Samaritan Was Required to Accept Remote Performance or Contract
     Suspension

HHI argues that Samaritan's impossibility defense should fail because Samaritan refused

HHI's offer either of remote performance of the contract or of suspending the contract until the

COVID-19 restrictions were lifted.

HHI relies on testimony from Robert Baranello, a former Samaritan employee who

negotiated the contracts for Samaritan in December 2019. Baranello asserts that HHI likely could

have performed its audits and trainings remotely, and that such performance would likely have

been cheaper for Samaritan. Sherman Decl., Ex 1 (Baranello Depo. Tr. 51:15–24) [Doc. No. 76-

1]. HHI also relies on Kathy Monahan's testimony that her job duties could have been performed remotely.[2]

Where the Master Agreement provided for site visits rather than remote services, Samaritan was under no express contractual obligation to accept alternative performance of HHI's consulting services. Even if the court were to consider extrinsic evidence on this point, HHI has not provided any contemporaneous evidence suggesting that entirely remote auditing, training, observation, and follow-up would have been within the parties' reasonable expectations of performance at the time the contract was entered into, or that HHI provided remote services during January, February, or March 2020.

There was also no requirement for Samaritan to suspend rather than terminate the Master Agreement once performance became impossible. HHI points to Inland Commercial Real Estate Services, LLC v. ASA EWC, LLC, 102 Mass. App. Ct. 796 (Mass. App. Ct. 2023) to dispute this point. But that case, in which a commercial lessee breached a rental agreement by failing to pay rent for several months where state COVID shutdown orders had closed its business, is inapposite where performance under the contract was rendered impossible, not merely more difficult, under the state restrictions on visitors. Cf. id. at 797–98.[3]   Accordingly, the doctrine of

---

[2] Harmony also references CEO Kris Mastrangelo's Affidavit in which she stated that Harmony and Samaritan had a contractual relationship that began in 2012, seven years before the Master Agreements at issue here were executed. Sherman Decl., Ex. 4 (Mastrangelo Aff. ¶¶ 10–11) [Doc. No. 76-4]. Mastrangelo states that under the 2012 contract, Harmony performed remote services. But the 2019 Master Agreements contained integration clauses providing that the Agreements "constitute[] the entire understanding of the parties relating to the subject matter hereof, [and] supersede[] all prior written and oral offers, negotiations, proposals, representations, agreements, courses of dealing and understandings between the parties relating to the subject matter hereof." Master Agreements 8 [Doc. Nos. 54-2, 54-3]. As a result, the language or performance due under a previous contract (which in any event was not entered into evidence) is irrelevant to a dispute regarding the 2019 Master Agreements.
[3] If Samaritan had failed to pay Harmony for consulting services rendered, Inland would far more closely parallel the facts of this dispute.

frustration of purpose is not applicable to Samaritan's termination of the contract[4]; nor is any presumption in favor of suspension rather than termination (which, in any case, is not a presumption afforded under the doctrine of impossibility) applicable where there was no indication that the restrictions were "temporary," see Inland, 102 Mass. App. Ct. at 800 (quoting Le Fort Enters., Inc., 491 Mass. at 161)), and indeed were still in effect when HHI filed this lawsuit in October 2020.

B.    *Covenant of Good Faith and Fair Dealing*

HHI also argues that Samaritan breached the covenant of good faith and fair dealing by using COVID-19 as an excuse to stop paying for consulting services where Samaritan's real motivation to terminate the contract was its tenuous financial position. Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract," UNO Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004), and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract," Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471–72, 583 N.E.2d 806 (1991). While the implied covenant may not "be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship," UNO Rests., 441 Mass. at 385–86, the essential inquiry is "whether the challenged conduct conformed to the parties' reasonable understanding of performance

---

[4] The doctrine of frustration of purpose is a "companion" doctrine to the doctrine of impossibility/impracticability and "differ[s] only in the effect of the fortuitous supervening event." Chase Precast Corp. v. John J. Paonessa Co., 409 Mass. 371, 374–75 (1991). "The difference [between the two] lies in the effect of the supervening event." Id. at 374. Where the doctrine of impossibility excuses performance where such performance is no longer achievable due to a supervening event, frustration of purpose excuses performance even where performance remains possible so long as the supervening event has destroyed the expected value of the contract.

obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 612 (D. Mass. 2016). "The plaintiff bears the burden of presenting evidence to demonstrate a lack of good faith, such as 'a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'" Clinical Tech., Inc. v. Covidien Sales, LLC, 192 F. Supp. 3d 223, 237 (D. Mass. 2016) (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013)).

Here, HHI has presented no evidence that Samaritan acted in bad faith by refusing to order consulting services after March 2020. When HHI inquired about April site visits, Morrow responded that due to COVID-19, Samaritan was unable to utilize HHI's services that month and asked to postpone. The next month, Samaritan contacted HHI to attempt to cancel the contract, again expressly informing HHI that the financial strain and visitor restrictions caused by COVID-19 prevented Samaritan from fulfilling its obligations. While Samaritan may have had little interest in continuing the contracts in light of the challenges facing nursing homes and assisted living facilities in the early days of the COVID-19 pandemic, its position to HHI that in-person site visits were expressly prohibited by state guidance was not "dishonest" or self-interested and in fact complied with those then-existing state regulations. See Young, 717 F.3d at 238 (implied covenant "cannot 'create rights and duties not otherwise provided for in the existing contractual relationship'"); see supra Section III.A.2 (permitting violations of state law not part of Samaritan's contracted-for performance obligations).

C.    *Quantum Meruit*

Samaritan also argues that it is entitled to summary judgment on HHI's quantum meruit claim because "[a] plaintiff is not entitled to recovery on a theory of quantum meruit where there

16

is a valid contract that defines the obligations of the parties." See Boston Med. Ctr. Corp. v. Sec'y of Exec. Off. Of Health & Hum. Servs., 463 Mass. 447, 467, 974 N.E.2d 1114 (2012).

HHI concedes that its quantum meruit argument fails. Accordingly, Samaritan's Motion is granted with respect to Count IV.

D.    *M.G.L. c. 93A*

"To state a claim under the consumer protection statute, [Mass. Gen. Laws ch. 93A, § 9], a plaintiff must allege facts sufficient to establish four elements:

> first, that the defendant has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or practice occurred 'in the conduct of any trade or commerce;' third, that the plaintiff suffered an injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury."

Rafferty v. Merck & Co., Inc., 479 Mass. 141, 161, 92 N.E.3d 1205 (2018). For a business plaintiff to state a claim under chapter 93A, it generally must plead the additional fifth element that there was a "commercial relationship" between itself and a defendant. Id. at 162 n.7.

In determining whether an act is "unfair" within the meaning of the statute, courts consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers. . . ." Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915 (1975)). An act is "deceptive" for these purposes "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." Lowell Gas Co. v. Att'y Gen., 377 Mass. 37, 51, 385 N.E.2d 240 (1979). Specifically, for an act to be deceptive, "(1) there must be a representation, practice, or omission likely to mislead consumers; (2) the consumers must be interpreting the message reasonably under the circumstances; and (3) the

misleading effects must be 'material,' that is likely to affect consumers' conduct or decision with regard to a product." <u>Tomasella v. Nestlé USA, Inc.</u>, 962 F.3d 60, 72 (1st Cir. 2020) (internal citation omitted). Additionally, because a claim of deception involves fraud, "Rule 9(b) requires that plaintiff 'to specifically plead the time, place, and content of [the] alleged false representation[s]' underlying the intentional misrepresentation and Chapter 93A claims." <u>O'Hara v. Diageo-Guinness, USA, Inc.</u>, 306 F. Supp. 3d 441, 461 (D. Mass. 2018) (quoting <u>Mulder v. Kohl's Dep't Stores, Inc.</u>, 865 F.3d 17, 22 (1st Cir. 2017)).

As discussed <u>supra</u> Section III.B, HHI has not alleged that Samaritan misled or deceived HHI, or otherwise acted in bad faith in its dealings with HHI. And a breach of contract standing alone "does not raise . . . to the level of a Chapter 93A violation." <u>Ahern v. Scholz</u>, 85 F.3d 774, 798 (1st Cir. 1996). Samaritan's motion is granted as to HHI's M.G.L. c. 93A claim.

## IV. Conclusion

For the foregoing reasons, Samaritan's Motion for Summary Judgment is GRANTED and HHI's Cross-Motion for Summary Judgment is DENIED.

IT IS SO ORDERED

July 18, 2024                                            /s/      Indira Talwani

United States District Judge